No. 96-582

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 120

EUGENE F. BEVACQUA,

Plaintiff and Appellant,

v.

UNION PACIFIC RAILROAD COMPANY,

Defendant and Respondent.

APPEAL FROM:    District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Alexander (Zander) Blewett, III, Hoyt & Blewett, Great Falls,
Montana

For Respondent:

Ausey H. Robnett, III, Paine, Hamblen, Coffin, Brooke &
Miller, Coeur D'Alene, Idaho; Dolphy O. Pohlman, Corette,
Pohlman, Allen, Black & Carlson, Butte, Montana

Submitted on Briefs: June 12, 1997

Decided: May 7, 1998
Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Eugene F. Bevacqua (Bevacqua) filed a claim in the District Court for the Second Judicial District, Silver Bow County, against Union Pacific Railroad Company (UP) alleging that UP had negligently injured him on three occasions while he was employed by UP.  A jury found UP partially liable and Bevacqua was awarded judgment in the amount of $320,000.  The District Court denied UP's motion for a new trial, but granted its motion to amend the judgment, thereby reducing the judgment to $40,000.  Bevacqua appeals from the District Court's order reducing the judgment and UP cross-appeals from the District Court's order denying UP's motion for a new trial.  We affirm in part, reverse in part and reinstate  the $320,000 verdict.

¶2    Bevacqua raised the following issue on appeal:

¶3    Whether the District Court erred in granting UP's motion to amend the judgment by reducing it from $320,000 to $40,000.

¶4    UP raised nine issues in its cross appeal; we consolidate and restate them as follows:

¶5    1.  Whether the District Court erred in holding that UP was estopped from relying on the statute of limitations for the 1973 and 1980 claims.

¶6    2.  Whether the District Court erred in instructing the jury that the physicians who examined Bevacqua were agents of UP.

¶7    3.  Whether the District Court erred in concluding that the release and settlement agreements executed by the parties following the 1973 and 1980 incidents were invalid.

¶8    4.  Whether the District Court erred in instructing the jury that a violation of the federal regulations applicable to locomotive noise emissions constitutes negligence per se.

¶9    5.  Whether the District Court erred in denying UP's motion for judgment as a matter of law on the issue of foreseeability as to the negligence claim arising from the 1990 incident.

¶10  6.  Whether the District Court erred in granting judgment as a matter of law in favor of Bevacqua on the issue of apportioning damages.

¶11  7.  Whether the special verdict form submitted to the jury was inherently confusing and misleading.

            Factual and Procedural Background

¶12    Bevacqua is a brakeman for UP in Spokane, Washington.  He has worked for UP since March 30, 1973.  On October 15, 1973, Bevacqua was

injured attempting to release a hand brake on a boxcar.  As he was descending the ladder of the car, his coat caught on a jagged piece of metal causing him to fall to the ground and injure his left knee.  He was taken to a hospital in Kellog, Idaho.  Bevacqua reported the injury to his immediate supervisor and submitted a written statement.  UP directed him to see a Dr. Tousey.  Bevacqua contended that UP did not give him a choice as to which doctor to see for his injury.  Dr. Tousey examined Bevacqua's knee, advised him that he had a simple sprain with no permanent injury, and released him to return to work after only a week.

¶13  The pain in Bevacqua's knee went away after a month.  He continued to perform his duties as a brakeman with UP, however, he noticed an occasional "popping" in his knee.  On December 24, 1973, Henry Lorring, a UP claims agent, paid Bevacqua $850 and presented him with a release of all claims which Bevacqua signed.  The release stated that it covered all claims "INCLUDING CLAIMS FOR INJURIES, IF ANY, WHICH ARE UNKNOWN TO ME AT THE PRESENT TIME. . . ."

¶14  Bevacqua was required to present himself for a physical examination to various doctors recommended by UP every two or three years to insure that he was physically capable of performing his job.  In 1975, UP directed Bevacqua to see Dr. Tousey again.  Dr. Tousey examined Bevacqua and cleared him to work as a brakeman with no restrictions.  In his report, Dr. Tousey did not mention the condition of Bevacqua's left knee.  In 1978, UP directed Bevacqua to see Dr. Maxwell Kepl.  Dr. Kepl examined Bevacqua and cleared him to return to his brakeman duties with no restrictions.

¶15  On March 31, 1980, Bevacqua was walking from the UP depot to the parking lot to take an evening meal break.  The area was not lighted and, unbeknownst to Bevacqua, UP had stored a pile of blackened railroad ties next to the designated walkway.  Bevacqua tripped over two of the ties that jutted out into the walkway causing him to re-injure his left knee.  He immediately reported the incident to UP whereupon he was taken to the hospital emergency room for treatment.  Bevacqua was directed to undergo a physical examination by Dr. Kepl before he could return to work.  Dr. Kepl advised Bevacqua that he had a simple sprain and cleared him to return to work after one week.

¶16  After returning to work, Ray McDeid, another UP claims agent, told Bevacqua that his knee had healed.  McDeid had Bevacqua sign another release and paid him $750.  This release contained language identical to that of the 1973 release regarding unknown injuries.  The pain from this injury subsided within a month, however, Bevacqua continued to have an occasional "popping" sensation in his knee.  After this second injury, UP required Bevacqua to see Dr. R. E. Elston on July 13, 1981, November 1, 1983, September 10, 1984, and March 30, 1987.  On each occasion, Dr. Elston determined that Bevacqua had no physical conditions which would restrict his work activities.

¶17  The third injury to Bevacqua's knee occurred on May 21, 1990.  United States Customs officials at the United States-Canada border crossing in

Eastport, Idaho had been complaining for a long period of time about the trains that were parked on the tracks near the customs' office. The engines were left idling due to the remoteness of the area and the possibility that the engines could not be restarted if shut down. Customs officials contended that the noise from the engines disrupted their business. UP failed to respond to the complaints and, on May 19, 1990, Customs Officer Keith Barnhart threatened UP with inspections if UP did not remedy the noise problem.

¶18  Two days later, on May 21, 1990, Barnhart inspected the train on which Bevacqua was working. When Barnhart requested that the crew produce their driver's licenses for identification purposes, Bevacqua was uncooperative. Barnhart lost his temper with Bevacqua and, in an effort to force Bevacqua to spread his legs so that Barnhart could frisk him, Barnhart kicked Bevacqua's left leg. This action caused Bevacqua's third injury to his left knee.

¶19  Bevacqua was sent by UP to Dr. Thomas Osten. After examining Bevacqua's knee, Dr. Osten referred him to Dr. Richard Treloar, an orthopedic surgeon in Spokane. Dr. Treloar's examination of Bevacqua's knee revealed that the anterior cruciate ligament (ACL), the primary stabilizer in the human knee, had ruptured. This rupture to the ACL caused significant stresses on the meniscus, the weight-bearing structures which cushion and stabilize the knee and act as shock absorbers. Both the lateral and the medial meniscus in Bevacqua's knee were severely torn. Dr. Treloar performed arthroscopic surgery in June 1990 to remove the torn meniscus and a second surgery in February 1991 to reconstruct the ruptured ACL.

¶20  Before permitting Bevacqua to return to work, UP required that he be examined by Dr. Paula Lantsberger. Dr. Lantsberger insisted that Bevacqua undergo extensive physical therapy before she would release him for work. Hence, in mid-March 1992, after completing his physical therapy, Bevacqua was permitted to return to work.

¶21  After the May 21, 1990 incident, Bevacqua filed a claim under the Federal Tort Claims Act (FTCA) against the federal government for battery based upon Barnhart's actions. Bevacqua lost this claim when the Ninth Circuit Court of Appeals held that Barnhart was immune from suit and that his conduct was privileged. However, during the FTCA proceeding, the government hired Dr. Peter Rork, an orthopedic surgeon from Jackson, Wyoming, to perform an independent medical examination of Bevacqua and testify as an expert witness. Dr. Rork testified that prior to the frisking incident, Bevacqua's left knee had a pre-existing condition comprised of a ruptured ACL and extensive tears in his medial and lateral meniscus. He further testified that the ACL was ruptured in the October 15, 1973 incident when Bevacqua fell from the boxcar and that the meniscus damage occurred in the March 31, 1980 incident when Bevacqua tripped over the railroad ties. Dr. Rork also testified that by 1990, Bevacqua had developed severe osteoarthritis in his left knee because of the first two injuries.

¶22  In February 1993, Bevacqua filed a claim against UP under the Federal

Employers' Liability Act (FELA), 45 U.S.C. §§ 51 - 60, alleging that UP was liable for damages sustained to his knee in the May 1990 incident. Bevacqua amended his complaint in November 1995 to also allege claims against UP arising from the 1973 and 1980 incidents. Additionally, he alleged that the releases he had signed in 1973 and 1980 were invalid due to mutual mistake of fact and that UP should be estopped from asserting the statute of limitations as a defense. UP hired Dr. Rork to present the same testimony for UP that he had presented on behalf of the government in the FTCA action.

¶23  The case was tried to a jury August 12 through 16, 1996. UP did not call Dr. Rork to testify as it had planned, however, Bevacqua read Dr. Rork's deposition to the jury. In that deposition, Dr. Rork reiterated that the 1990 incident aggravated the injuries to Bevacqua's knee stemming from the 1973 and 1980 incidents.

¶24  Dr. Treloar also did not appear in person but his deposition was read to the jury. In his deposition, Dr. Treloar stated that the ACL was definitely missing from Bevacqua's left knee long before the 1990 incident. He maintained that Bevacqua ruptured his ACL in the 1973 incident and that he tore the medial and lateral meniscus in his knee in both the 1973 and 1980 incidents. Dr. Treloar also testified that the only injury caused by the 1990 incident was a small extension of the tear to the medial meniscus.

¶25  Dr. Lantsberger testified in person. She stated that since she had been treating Bevacqua, the degenerative arthritis in his left knee had increased substantially indicating that there is further degeneration to the bone surfaces in his knee. She noted that the injuries Bevacqua sustained in the 1973 and 1980 incidents were contributory to his degenerative arthritic condition and that he will continue to have further progression of the degeneration in his left knee.

¶26  At the close of the evidence, both parties moved the court for judgment as a matter of law pursuant to Rule 50(a), M.R.Civ.P. UP moved for judgment on all claims arising from the 1973 and 1980 incidents on the grounds that those claims were precluded by the three-year statute of limitations and by the settlement agreements as reflected in the releases signed by Bevacqua. UP also moved the court for judgment as a matter of law on all negligence claims related to the 1990 incident contending that there was no evidence that UP was negligent, that the consequences of its actions were foreseeable, or that its actions caused Bevacqua's injuries. The District Court denied these motions.

¶27  Bevacqua moved for judgment as a matter of law on the statute of limitations and release issues with respect to the 1973 and 1980 incidents. The District Court granted both motions ruling that the releases were invalid due to mutual mistake of fact and that UP was estopped from asserting the statute of limitations defense to the 1973 and 1980 incidents because the doctors to whom Bevacqua was sent misdiagnosed the injuries. Bevacqua also moved the court for judgment as a matter of law on the issue of apportionment. The court granted this motion directing that there would be no apportionment of Bevacqua's damages between the 1973, 1980, and 1990 incidents as UP had

totally failed in its burden to put on any evidence of apportionment regarding the preexisting conditions.

¶28  The District Court presented a 23-question special verdict form, which had been submitted by Bevacqua, to the jury.  UP objected to the use of this form but did not offer an alternative form.  Based on this form, the jury, during deliberations,  asked if the total amount of damages decided for each incident would be added together for a total award.  In response, UP and Bevacqua stipulated that under the admitted facts and the law of FELA, the amount of damages incurred in each incident should be the same and that the amount of damages for each of the three incidents would not, under any circumstances, be added together.

¶29  The jury returned a verdict finding that UP caused Bevacqua damages in the amount of $400,000.  The jury also found that UP was 50% negligent in the 1973 incident, 80% negligent in the 1980 incident, and 10% negligent in the 1990 incident.  This amounted to damages of $200,000, $320,000 and $40,000, respectively.

¶30  Thereafter, the District Court entered judgment in favor of Bevacqua for $320,000, the amount of the jury's verdict in the 1980 incident.  UP moved to amend the judgment pursuant to Rule 59(g), M.R.Civ.P., on the grounds that the judgment did not "reasonably reflect or accurately state" the jury verdict.  The court granted UP's motion and reduced the award to $40,000, the amount of the jury's verdict in the 1990 incident.  UP also filed a motion for a new trial based on what it perceived as prejudicial errors, but the court denied that motion.

¶31  Bevacqua appeals the District Court's reduction of the judgment and UP cross-appeals the denial of its motion for a new trial as well as the denial of its several motions for judgment as a matter of law.

### Bevacqua's Issue on Appeal

¶32  Whether the District Court erred in granting UP's motion to amend the judgment by reducing it from $320,000 to $40,000.

¶33  The jury determined that UP caused Bevacqua $400,000 in damages and that UP was 50% negligent in the 1973 incident, 80% negligent in the 1980 incident, and 10% negligent in the 1990 incident.  However, since the parties had stipulated that the amount of damages for each of the three incidents would not be added together, the District Court entered judgment in favor of Bevacqua for $320,000, the amount of the jury's verdict in the 1980 incident.

¶34  UP moved to amend the judgment pursuant to Rule 59(g), M.R.Civ.P., contending that since the injuries sustained in the 1973 and 1980 incidents were asymptomatic resulting in minimal wage loss and no pain or discomfort, Bevacqua should only be compensated for the 1990 incident as it was that incident that caused the damage for which the jury awarded a total of

$400,000. The District Court granted UP's motion and reduced the award to $40,000, the amount of the jury's verdict in the 1990 incident. In amending the judgment, the court stated:

> As the substantial evidence supports that the May 21, 1990, incident caused the Plaintiff's physical condition to become symptomatic, resulting in the need for corrective surgeries and rehabilitation, the percentages of fault for the May 21, 1990, incident are applicable to the total jury verdict of $400,000.

¶35  Bevacqua contends that the District Court erred in reducing the judgment to reflect the amount awarded for only the 1990 incident as that effectively nullifies the jury award for the 1973 and 1980 incidents. Bevacqua argues that, because the jury found independent negligence and causation in each of the three incidents, each incident played a part in causing the current condition of his knee. He maintains that, if not for the stipulation that the damage awards would not be added together, he would be entitled to $200,000 for the 1973 incident, $320,000 for the 1980 incident, and $40,000 for the 1990 incident. Hence, he argues that he should receive the greater of these, the $320,000, and that the smaller two awards are subsumed in that amount.

¶36  The amendment of a judgment under Rule 59(g), M.R.Civ.P., is within the discretion of a district court, thus, we review a court's grant or denial of a motion to amend for an abuse of discretion. See Estate of Nielsen v. Pardis (1994), 265 Mont. 470, 478, 878 P.2d 234, 238 (citations omitted).

¶37  In Rogers v. Missouri Pacific Railroad Co. (1957), 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, the United States Supreme Court held that, under FELA, an injured railroad worker is entitled to recover damages if the negligence of the railroad played any part, no matter how slight, in causing the injury or death for which damages are sought. In like manner, if Bevacqua proved that UP was negligent in each of the three incidents and that UP's negligence in each incident played any part, no matter how slight, in causing injury to Bevacqua's knee, then he would be entitled to collect damages for each separate independent act of negligence.

¶38  In Bevacqua's case, the jury specifically found independent negligence and causation in each incident and that each incident played a part in causing the current condition of Bevacqua's knee. Hence, Bevacqua could be entitled to a judgment of $200,000 for the 1973 incident, $320,000 for the 1980 incident, and $40,000 for the 1990 incident. However, because of the stipulation with UP that the jury awards for each incident would not be added together, Bevacqua cannot collect any double recovery. Nonetheless, Bevacqua should receive judgment in the amount of $320,000, the greater of the jury awards, and the smaller awards of $40,000 and $200,000 are, as Bevacqua suggested, subsumed in that amount. The District Court's amended judgment vitiates the jury's determination that the 1973 and 1980 incidents played some part in causing Bevacqua's injuries. Moreover, whether Bevacqua's knee was symptomatic only after 1990, as the District Court

pointed out, is not the standard to be applied under FELA.

¶39   In its amended judgment, the District Court stated that it was the 1990 incident that resulted in the need for corrective surgeries and rehabilitation for Bevacqua's knee.  Similarly, UP contends that the jury would not have awarded Bevacqua $400,000 in damages had the 1990 incident not occurred because it was that incident that required Bevacqua to seek surgery.  Both UP and the District Court are incorrect.

¶40   Drs. Treloar and Rork stated in their depositions that the ACL in Bevacqua's left knee ruptured in the 1973 incident and that the extensive tears in his medial and lateral meniscus occurred in the 1980 incident.  Both doctors testified that the 1990 incident aggravated the injuries to Bevacqua's knee caused by the prior incidents.  In addition, Dr. Treloar testified that the 1990 incident caused a small extension of the tear to the medial meniscus in Bevacqua's knee.  Dr. Treloar also stated that Bevacqua's knee would have required surgery even without the occurrence of the 1990 incident.  Dr. Rork agreed with this assessment and stated that the condition of Bevacqua's knee worsened because he did not have surgery to repair the knee after the 1973 incident.  In addition, Dr. Treloar stated that it would be impossible to apportion how much of Bevacqua's pain and disability was caused by the 1990 incident as compared to the prior incidents.

¶41   Accordingly, we hold that the District Court erred in granting UP's motion to amend the judgment, hence, we reverse and reinstate the $320,000 verdict.

¶42   In his reply brief on appeal, Bevacqua requests, for the first time, that we impose sanctions against UP under Rule 11, M.R.Civ.P., for taking a position in its motion to amend the judgment that was inconsistent with its trial position.  Bevacqua asserts that, before and during trial, UP argued that the 1990 incident caused only a relatively minor injury and that, in its motion to amend the judgment, UP argued that it was the 1990 incident that caused the damages to Bevacqua's knee.

¶43   This Court will not address an issue presented for the first time on appeal.  Rasmussen v. Lee (1996), 276 Mont. 84, 88, 916 P.2d 98, 100 (citing Fandrich v. Capital Ford Lincoln Mercury (1995), 272 Mont. 425, 431, 901 P.2d 112, 115-16).  Bevacqua could have raised this issue before the trial court in its response to UP's motion to amend, but he failed to do so.

                  UP's Issues on Cross Appeal

¶44   UP appeals the District Court's denial of its motion for a new trial based on what it perceives as irregularities in the proceedings and prejudicial errors.  UP also appeals the court's denial of its several motions for judgment as a matter of law on the issues of the statute of limitations, the validity of the releases, and the lack of foreseeability in the 1990 negligence claim.

¶45   The decision to grant or deny a new trial is within the sound discretion

of the trial judge and we will not disturb that decision absent a manifest abuse of discretion. Baxter v. Archie Cochrane Motors, Inc. (1995), 271 Mont. 286, 287-88, 895 P.2d 631, 632 (citing Jim's Excavating Service v. HKM Assoc.(1994), 265 Mont. 494, 512, 878 P.2d 248, 259).

¶46 A motion for judgment as a matter of law is governed by Rule 50, M.R.Civ.P., which provides, in pertinent part:

> If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, cross-claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

Rule 50(a)(1), M.R.Civ.P. This Court's standard of review of appeals from district court orders granting or denying motions for judgment as a matter of law is identical to that of the district court. Durden v. Hydro Flame Corp., 1998 MT 47, ¶ 22, ___ P.2d ___, ¶ 22, 55 St.Rep. 198, ¶ 22 (citing Ryan v. City of Bozeman (1996), 279 Mont. 507, 510, 928 P.2d 228, 229-30). Judgment as a matter of law is properly granted only when there is a complete absence of any evidence which would justify submitting an issue to a jury and all such evidence and any legitimate inferences that might be drawn from that evidence must be considered in the light most favorable to the party opposing the motion. Durden, ¶ 21 (citing Jacques v. Montana Nat. Guard (1982), 199 Mont. 493, 504, 649 P.2d 1319, 1325).

Cross-Appeal Issue 1.

¶47 Whether the District Court erred in holding that UP was estopped from relying on the statute of limitations for the 1973 and 1980 claims.

¶48 FELA provides that no action shall be maintained under this act unless commenced within three years from the day the cause of action accrued. 45 U.S.C. § 56. Both parties moved for judgment as a matter of law on the statute-of-limitations issue at the conclusion of the evidence. UP contended that Bevacqua's cause of action accrued upon the occurrence of the injury regardless of whether the full extent of the disability was known at that time. Bevacqua contended that he was misled into not filing suit within the three-year statutory period as the doctors who conducted his physical examinations between 1973 and 1990 were agents of UP and none of those doctors advised him of the full extent of his knee injury. The District Court ruled that estoppel tolled the statute, therefore the court instructed the jury that FELA's three-year statute of limitations did not apply to Bevacqua's 1973 and 1980 claims.

¶49 The United States Supreme Court has repeatedly held that FELA is to be given a liberal construction in favor of injured railroad workers so that it may accomplish the humanitarian and remedial purposes intended by Congress. Davis v. Union Pacific R.Co. (1997), 282 Mont. 233, 245, 937 P.2d

27, 34 (citing Consolidated Rail Corp. v. Gottshall (1994), 512 U.S. 532, 543, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427; Urie v. Thompson (1949), 337 U.S. 163, 180-81, 69 S.Ct. 1018, 1030, 93 L.Ed. 1282). This Court has followed federal case law in giving a liberal construction to FELA in favor of injured railroad workers. Davis, 282 Mont. at 245, 937 P.2d at 34 (citations omitted).

¶50 FELA's statute of limitations is primarily designed to assure fairness to defendants. Burnett v. New York Central Railroad Co. (1965), 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941. Nevertheless, this policy of repose is frequently outweighed where the interests of justice require vindication of the plaintiff's rights. Burnett, 380 U.S. at 428, 85 S.Ct. at 1055.

¶51 In Glus v. Brooklyn Eastern District Terminal (1959), 359 U.S. 231, 235, 79 S.Ct. 760, 763, 3 L.Ed.2d 770, the United States Supreme Court held that a plaintiff is entitled to have his cause tried on the merits, even though he did not file suit within the limitation period prescribed by FELA, if he could prove that misrepresentations were made by agents of the railroad and that those misrepresentations justifiably misled him into not filing suit within the three-year statutory period.

¶52 Relying on Glus, the Ninth Circuit Court of Appeals has determined that a FELA defendant may be estopped from raising the statute of limitations for equitable reasons. Atkins v. Union Pacific Railroad Co. (9th Cir. 1982), 685 F.2d 1146, 1148 (citations omitted).

> [C]onduct or representations by the defendant-employer which tend to "lull (the plaintiff) into a false sense of security," can estop the defendant from raising the statute of limitations, on the general equitable principle that "no man may take advantage of his own wrong."

Atkins, 685 F.2d at 1149.

¶53 In Fletcher v. Union Pacific Railroad Co. (8th Cir. 1980), 621 F.2d 902, 906, the Eighth Circuit Court of Appeals held that a railroad is equitably estopped from asserting the statute of limitations as a defense "even if the misrepresentations upon which the employee relied were unintentional." In addition, the court in Fletcher stated: "Generally, a railroad has no duty to ascertain whether an employee is physically fit for his job, but if it undertakes to give physical examinations, it is liable if it performs such undertaking negligently." Fletcher, 621 F.2d at 909. Even though the court held that Fletcher's claim was barred by the statute of limitations because there was no misrepresentation within three years of filing suit, the court determined that the doctor was "almost certainly an agent of the employer" and that "the employer undoubtedly has a hand in setting the standards for disability and employment physicals." Fletcher, 621 F.2d at 909 n.9.

¶54 Moreover, the court in Fletcher determined that "[w]here a physician certifies the employee as fit to return to heavy labor, it is not the employee's burden to show malpractice by the examining physician." Fletcher, 621 F.2d at 909. In making this determination, the court noted that "most such cases

find that the examining physician was an agent of the railroad." Fletcher, 621 F.2d at 909 n.10.

¶55 Similarly, in Louisville & Nashville Railroad Co. v. Disspain (6th Cir. 1960), 275 F.2d 25, the plaintiff was sent to a doctor chosen by the railroad. This doctor stated that there was nothing wrong with plaintiff and that he should return to work. However, two years later, another doctor informed plaintiff that he had a disintegrated intervertebral disc which required surgery. The railroad claimed that the first doctor was not its employee but an independent physician, hence it should not be estopped from raising the statute of limitations. Disspain, 275 F.2d at 26.

¶56 The Sixth Circuit Court of Appeals held that it was sufficient if the doctor's misrepresentation concerned the matter he was to perform for the railroad--i.e., a physical examination. Moreover, the court determined that when the doctor is an independent physician and is requested by the railroad to examine an employee to determine if that employee is capable of continuing to work, "it can hardly be said that the doctor acted without authority or on his own." Disspain, 275 F.2d at 26.

¶57 Bevacqua underwent several physical examinations at the behest of UP by doctors designated by UP. Each time he was certified as fit to return to work. Additionally, Doctors Tousey, Kepl and Elston each filled out forms setting forth Bevacqua's physical condition. These forms were provided by UP and contained UP's name and logo. Moreover, the diagnoses of the doctors that examined Bevacqua between 1973 and 1990 to the effect that Bevacqua had a soft tissue bruise or a minor sprain or strain were unequivocally wrong. None of the doctors, prior to Dr. Treloar in 1990, ever diagnosed that Bevacqua had a ruptured ACL, torn meniscus, or degenerative arthritis in his left knee, even though several other doctors later testified that those conditions had been present since the 1973 and 1980 incidents.

¶58 UP most certainly had a hand in setting the standards for the employment physicals and, since UP undertook to give these physical examinations, UP is liable for any negligence that occurred in those examinations. Fletcher, 621 F.2d at 909. Even though the doctors were independent physicians, they were requested by UP to examine Bevacqua to determine if he was capable of continuing to work, thus it cannot be said that the doctors who examined Bevacqua at UP's request acted without authority or on their own. Disspain, 275 F.2d at 26.

¶59 Therefore, we hold that the doctors who examined Bevacqua between 1973 and 1990 were acting as agents of UP. Moreover, those doctors misrepresented Bevacqua's injuries as either a soft-tissue bruise or a minor strain or sprain and those misrepresentations misled Bevacqua into not filing suit within the three-year statutory period. Consequently, UP should not now be allowed to take advantage of its own wrong. Atkins, 685 F.2d at 1149.

¶60 Since misrepresentations were made by agents of UP and those

misrepresentations misled Bevacqua into not filing suit within the three-year statutory period, Bevacqua is entitled to have his cause tried on the merits. Glus, 359 U.S. at 235, 79 S.Ct. at 763. In this case, the interests of justice require vindication of Bevacqua's rights. Burnett, 380 U.S. at 428, 85 S.Ct. at 1055.

¶61 Accordingly, we hold that the District Court did not err in ruling that UP was estopped from relying on the three-year statute of limitations.
                    Cross-Appeal Issue 2.

¶62 Whether the District Court erred in instructing the jury that the physicians who examined Bevacqua were agents of UP.

¶63 A district court has broad discretion regarding the instructions it gives or refuses to give to a jury. Schumacher v. Stephens, 1998 MT 58, ¶ 21, ___ P.2d ___, ¶ 21, 55 St.Rep. 247, ¶ 21 (citations omitted). We will not reverse a district court on the basis of its instructions absent an abuse of discretion. Schumacher, ¶ 21. Furthermore, the party assigning error to the trial court's instructions must show prejudice in order to prevail and prejudice will not be found if the jury instructions in their entirety state the applicable law of the case. Schumacher, ¶ 22.

¶64 The District Court's Instruction No. 34 states:
    In this case, to determine if the doctors who initially
treated the plaintiff were agents of the railroad you may
consider these factors:
    1. Was the medical care provided pursuant to a contract
or statute;
    2. Who pays the physicians or contributes to the fund for
compensating the physicians;
    3. Who administers the fund and how;
    4. Who selects the physicians;
    5. Who sets the standards for employment and disability
physicals;
    6. Whether injured employees are required to report to
the company physician;
    7. What non-monetary advantages accrue to the railroad;
and what is the custom and practice.

UP contends that this instruction, besides being confusing, is "just plain wrong."

¶65 In addition, the court's Instruction No. 36 states:
    Since the statements made by the doctors to plaintiff
concern the very matter he was employed by the railroad to
perform, the doctor was not acting on his own but was acting on
behalf of the defendant and the defendant is responsible for all
the acts of these doctors.

UP argues that this instruction contradicts Instruction No. 34 and is "totally at

odds with the evidence."

¶66  We held previously in this opinion that the doctors who examined Bevacqua were indeed agents of UP because they were acting on UP's behalf. As such, UP is liable for any negligence that occurred in those examinations. Thus, the District Court's Instruction No. 36 is not "totally at odds with the evidence," but is correct.  Instruction No. 34, however, is inaccurate and contradictory.  Since it was already determined that the doctors who initially treated Bevacqua were agents of UP, it was unnecessary for the jury to decide that issue. While these two instructions given together may have been confusing, UP has failed to show that it was prejudiced by these instructions; the instructions, in their entirety, state the applicable law of the case. Schumacher, ¶ 22.

¶67  Accordingly, we hold that the District Court did not err in instructing the jury that the physicians who examined Bevacqua were agents of UP.
                    Cross-Appeal Issue 3.

¶68  Whether the District Court erred in concluding that the release and settlement agreements executed by the parties following the 1973 and 1980 incidents were invalid.

¶69  After both the 1973 and 1980 incidents, Bevacqua signed a release purporting to settle all claims arising from those incidents.  Both releases stated that the parties were settling all claims "INCLUDING CLAIMS FOR INJURIES, IF ANY, WHICH ARE UNKNOWN TO ME AT THE PRESENT TIME. . . ."  At the close of the evidence in this case, both parties moved for judgment as a matter of law on the release issue.  UP argued that Bevacqua was foreclosed from pursuing his 1973 and 1980 claims because the releases settled any claims arising from those incidents.  Bevacqua argued that a mutual mistake of fact occurred thus  the releases were invalid.  The District Court agreed with Bevacqua and concluded that the releases were invalid as a matter of law due to a mutual mistake of fact.

¶70  The validity of a release in a FELA action is governed by federal rather than state law. Wilson v. CSX Transp., Inc. (6th Cir. 1996), 83 F.3d 742, 745 cert denied by CSX Transp., Inc. v. Wilson (1996), ___ U.S. ___, 117 S.Ct. 295, 136 L.Ed.2d 214 (citing Maynard v. Durham & S. R. Co. (1961), 365 U.S. 160, 161, 81 S.Ct. 561, 562, 5 L.Ed.2d 486).  See also Taylor v. Chesapeake and Ohio Railway Company (4th Cir. 1975), 518 F.2d 536, 537; Dice v. Akron, Canton & Youngstown R. Co. (1952), 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398; Brophy v. Cincinnati, New Orleans, & Texas Pacific Railway Co. (S.D.Ohio 1994), 855 F.Supp. 213, 215.  A FELA release may be set aside on the basis of mutual mistake of fact in executing the release.  Counts v. Burlington Northern R. Co. (9th Cir. 1991), 952 F.2d 1136, 1141 (citing Callen v. Pennsylvania R. Co. (1948), 332 U.S. 625, 630, 68 S.Ct. 296, 298, 92 L.Ed. 242).  However, under FELA, a mutual mistake of fact is sufficient to avoid a release only when the mistake goes to the nature of the injury and the mistaken belief is held by both parties.  Wilson, 83 F.3d at 745.

¶71  UP argues that a mutual mistake of fact did not exist because Bevacqua was aware there was still something wrong with his knee based on the "popping" sensation that continued to exist.  On the contrary, even though the "popping" in his knee continued, Bevacqua was lulled into believing that nothing was wrong with his knee because of the repeated assurances by the various doctors that examined him at UP's request.  All of these doctors released Bevacqua to return to work; none of these doctors diagnosed Bevacqua's knee injury as anything serious.

¶72  Moreover, Henry Lorring, the UP claims agent at the time of the 1973 incident, relied on the medical records received from Dr. Tousey.  These records indicated that Bevacqua had a simple sprain with no permanent injury.  Lorring related this information to Bevacqua before the 1973 release was signed.  Ray McDeid, the UP claim's agent at the time of the 1980 incident, testified that he was not aware of the extent of Bevacqua's injuries at the time the release was signed.  He also testified that the $750 paid for the 1980 release was far too low for a ruptured ACL and torn meniscus.  Hence, a mutual mistake of fact in executing the releases did occur in this case and, under the law of FELA, that is sufficient to set aside the releases.  Callen, 332 U.S. at 630, 68 S.Ct. at 298; Counts, 952 F.2d at 1141.

¶73  Accordingly, we hold that the District Court did not err in invalidating the release and settlement agreements executed by the parties following the 1973 and 1980 incidents.

                    Cross-Appeal Issue 4.

¶74  Whether the District Court erred in instructing the jury that a violation of the federal regulations applicable to locomotive noise emissions constitutes negligence per se.

¶75  As we stated elsewhere in this opinion, a district court has broad discretion regarding the instructions it gives or refuses to give to a jury and we will not reverse a district court on the basis of its instructions absent an abuse of discretion.  Schumacher, ¶ 21.

¶76  Bevacqua contended at trial that the injury he sustained in 1990 was caused by UP's negligence.  He theorized that UP engaged in negligent practices by parking idling locomotives near the customs' office inconveniencing customs officials and that the excessive noise emitted from the locomotive parked near the customs' office angered Barnhart causing him to assault Bevacqua.  Both theories were predicated on the noise emissions from the locomotives.

¶77  The District Court instructed the jury that federal railroad regulations require that any railroad that uses railroad equipment that is noise defective must correct the defect or remove the defective equipment from service.  Additionally, the court instructed the jury that if the jury found that UP violated this regulation and that such violation played any part in causing Bevacqua's injuries, then UP was negligent as a matter of law.

¶78 UP contends that the District Court's instructions are in direct contradiction of the law as previously established by this Court. UP cites several Montana cases for the proposition that a violation of a statute may constitute negligence per se under certain circumstances, however, the violation of a regulation does not. Thus, UP asserts that since locomotive noise emission standards are federal regulations and are not statutory, we should consider any violation as merely evidence of negligence and not negligence per se. In addition, UP contends that even if a statute had been violated, it would not be negligence per se unless Bevacqua belonged to the specific class of persons the statute was enacted to protect and the injury Bevacqua sustained was of the sort the statute was enacted to prevent.

¶79 While UP's contentions are correct as applied to Montana statutory and regulatory law, they are incorrect when applied to FELA. In a FELA action, "the violation of a statute or regulation, such as [a regulation regarding radio standards and procedures] automatically constitutes breach of the employer's duty and negligence per se and will result in liability if the violation contributed in fact to the plaintiff's injury." Walden v. Illinois Central Gulf Railroad (7th Cir. 1992), 975 F.2d 361, 364. Accord Kernan v. American Dredging Co. (1958), 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (holding that recovery was permissible, without any showing of negligence, for death resulting from the violation of a rule concerning lighting equipment); Pratico v. Portland Terminal Co. (1st Cir. 1985), 783 F.2d 255 (wherein the court determined that a jury instruction requiring the jury to find the defendant negligent as a matter of law if the defendant violated an OSHA regulation and such violation was a proximate cause of plaintiff's injury, was correct as a matter of law).

¶80 In addition, the United States Supreme Court stated in Kernan that

the theory of the FELA is that where the employer's conduct falls short of the high standard required of him by this Act, and his fault, in whole or in part, causes injury, liability ensues. And this result follows whether the fault is a violation of a statutory duty or the more general duty of acting with care, for the employer owes the employee, as much as the duty of acting with care, the duty of complying with his statutory obligations.

Kernan, 355 U.S. at 438-39, 78 S.Ct. at 401.

¶81 In the case before us, evidence at trial established that, prior to the 1990 incident, one of the locomotives left idling on the tracks near the customs building had a defective valve which prevented the air tanks from closing properly and causing the tanks to blow out air. Under FELA:

Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of . . . such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines . . . or other equipment.

45 U.S.C. § 51 (emphasis added).

¶82  Furthermore, contrary to UP's contention that even if it had violated a statute, it would not be negligence per se unless Bevacqua belonged to the specific class of persons the statute was enacted to protect and the injury Bevacqua sustained was of the sort the statute was enacted to prevent, the United States Supreme Court has held that the violation of a statute or regulation creates liability under FELA without regard to whether the injury flowing from the violation was the injury the statute or regulation sought to prevent, if the violation contributed in fact to the injury.  Kernan, 355 U.S. at 433, 78 S.Ct. at 398.  Accord Pratico, 783 F.2d at 263.

¶83  Accordingly, we hold that the District Court did not err when it instructed the jury that a violation of the federal regulations applicable to locomotive noise emissions constituted negligence per se.
                    Cross-Appeal Issue 5.

¶84  Whether the District Court erred in denying UP's motion for judgment as a matter of law on the issue of foreseeability as to the negligence claim arising from the 1990 incident.

¶85  UP contends that, in order to prevail on a FELA negligence claim, Bevacqua must prove the traditional common law components of negligence, including duty, breach, causation and injury.  UP argues that Bevacqua failed in this regard as to the 1990 incident in that he did not establish the element of foreseeability because he did not submit any evidence that UP knew or should have known that its activities with respect to the idling locomotives created a reasonable possibility of harm to Bevacqua.

¶86  We have already determined elsewhere in this opinion that violation of a federal regulation is negligence per se under FELA, Walden, 975 F.2d at 364, and, as such, it is not necessary to establish the element of foreseeability as negligence is proven by evidence that the locomotive-noise-emission standards were violated.  Evidence at trial established that prior to the 1990 incident, a locomotive with a stuck pop valve was parked on the tracks near the customs building.  This pop valve prevented the air tanks on the engine from closing  properly, thus it blew air for several hours.  The fact of the violation of the regulation appears undisputed.

¶87  Accordingly, we hold that the District Court did not err in denying UP's motion for judgment as a matter of law on the negligence claims arising from the 1990 incident.
                    Cross-Appeal Issue 6.

¶88  Whether the District Court erred in granting judgment as a matter of law in favor of Bevacqua on the issue of apportioning damages.

¶89  Bevacqua moved for judgment as a matter of law on the issue of

apportionment and the District Court granted that motion directing that there would be no apportionment between the 1973, 1980 and 1990 incidents as UP had totally failed in its burden to put on any evidence of apportionment regarding the preexisting conditions.

¶90  UP contends that the District Court erred in granting Bevacqua's motion because there was evidence from which the jury could have apportioned the damages between the injuries sustained in the 1973, 1980 and 1990 incidents. UP asserts that statements made by Bevacqua's expert witness, Dr. Treloar, differentiates between the injuries sustained prior to 1990 and the injuries sustained in the 1990 incident.  On the contrary, Dr. Treloar testified that it would be impossible for him to accurately apportion damages between the three incidents.  Furthermore, UP did not call any medical expert to testify in its behalf, thus, the undisputed medical evidence revealed that the 1980 incident aggravated the preexisting condition caused by the 1973 incident and that the 1990 incident aggravated the preexisting condition caused by both the 1973 and 1980 incidents.

¶91   In a case factually similar to the case before us wherein the plaintiff suffered two work-related back injuries prior to the injury for which he brought a claim, we stated that

> to impose upon the plaintiff the sometimes impossible burden of proving which tortious act did which harm, would be an expression of a judicial policy that it is better that a plaintiff, injured through no fault of his own, should take nothing simply because he could not prove which tortious act caused which harm.  We believe, on the other hand, that where the tortious act is established, it is better that the tortfeasor should be subject to paying more than his theoretical share of the damages in a situation where the tortious conduct has contributed to the confused situation making it difficult to prove which tortious act did the harm.

Callihan v. Burlington Northern, Inc. (1982), 201 Mont. 350, 357, 654 P.2d 972, 976 (quoting Azure v. City of Billings (1979), 182 Mont. 234, 253,  596 P.2d 460, 470-71).

¶92  Accordingly, we hold that the District Court did not err in refusing to apportion damages between the 1973, 1980 and 1990 incidents.
                    Cross-Appeal Issue 7.

¶93  Whether the special verdict form submitted to the jury was inherently confusing and misleading.

¶94  The District Court submitted the case to the jury on a 23-question special verdict form that had been proposed by Bevacqua.  UP objected to the use of this form, but did not offer an alternative form.  UP contends on appeal that the use of this special verdict form was error on the part of the District Court because the form was inherently confusing and did not clearly indicate the jury's intent with respect to the damages issue.

¶95  During the course of its deliberations, the jury posed a question for the court.  The question focused on the interrogatories in the special verdict form which referred to the amount of damages for each of the three incidents.  The jury inquired whether the amount of damages for each incident would "get added together or not for the total award?"  After discussion with counsel, the court responded that the jury should fill in the same damages figure for each incident and that the figures would not be totaled.  UP now contends that the jury's question indicates that the jury intended to apportion damages between the three incidents but was unable to do so because of the court's ruling.

¶96  Special verdicts are governed by Rule 49(a), M.R.Civ.P., which provides as follows:

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

The use of a special verdict form is left to the discretion of the trial court. Rule 49(a), M.R.Civ.P.; Barthule v. Karman (1994), 268 Mont. 477, 488, 886 P.2d 971, 978 (citing Kinjerski v. Lamey (1981), 194 Mont. 38, 41, 635 P.2d 566, 567).  "While it is within the trial court's discretion to structure the form and frame the questions of a special verdict, the interrogatories must be adequate to enable the jury to determine the factual issues essential to judgment."  Kinjerski, 194 Mont. at 41, 635 P.2d at 567 (citations omitted).

¶97  We use a three-part standard to determine the adequacy of a special verdict form:

> 1)  whether, when read as a whole and in conjunction with the general charge, the interrogatories adequately presented the contested issues to the jury;
>
> 2)  whether the submission of the issues to the jury was fair; and
>
> 3)  whether the ultimate questions of fact were clearly submitted to the jury.

Story v. City of Bozeman (1993), 259 Mont. 207, 229, 856 P.2d 202, 215

(citing Kinjerski, 194 Mont. at 41, 635 P.2d at 568).  If the evidence does not support a claim, then the trial court should not allow a jury to consider the claim on the special verdict form.  Story, 259 Mont. at 229, 856 P.2d at 215 (citing R.H. Grover, Inc. v. Flynn Ins. Co. (1989), 238 Mont. 278, 284, 777 P.2d 338, 342).

¶98  In the case before us on appeal, although the jury found it necessary to ask a question about one portion of the special verdict form, they were able to determine the factual issues essential to the judgment once their question was answered.  In addition, when read as a whole, the interrogatories adequately presented the contested issues to the jury, the submission of the issues to the jury was fair, and the ultimate questions of fact were clearly submitted.  Furthermore, UP did not make any substantial objections at trial that would require reversal on this issue.

¶99  Accordingly, we hold that the special verdict form submitted to the jury in this case was not inherently confusing and the District Court did not abuse its discretion in using this form.

                    Conclusion

¶100 We reverse the District Court's order granting UP's motion to amend the judgment and we reinstate the $320,000 verdict.   In addition, we affirm on each of UP's specifications of error and we deny Bevacqua's request for  Rule 11 sanctions.


                    /S/   JAMES C. NELSON

We Concur:

/S/  J. A.  TURNAGE
/S/  KARLA M. GRAY
/S/  JIM REGNIER
/S/  WILLIAM E. HUNT, SR.